1

1          UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF NEW YORK
2
    ---------------------------------X
3   BRYANT, et al.,
                              :   09-CV-01751
4                                 (SJF)
            Plaintiffs,
5                             :   United States Courthouse
        -against-                 Central Islip, New York
6
    MILHORAT, et al.,
7                             :   December 2, 2009
            Defendants.
8   ---------------------------------X
9            TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE SANDRA J. FEUERSTEIN
10           UNITED STATES DISTRICT COURT JUDGE

11
    APPEARANCES:
12
    For the Plaintiffs:      LEE S. GOLDSMITH, ESQ.
13                           Goldsmith, Ctorides & Rodriguez, LLP
                             747 Third Avenue, 37th Floor
14                           New York, New York 10017

15
                             GENE LOCKS, ESQ.
16                           Locks Law Firm
                             747 Third Avenue, 37th Floor
17                           New York, New York 10017

18
    For the Defendants:      ANTHONY M. SOLA, ESQ.
19                           Martin Clearwater & Bell, LLP
                             220 East 42nd Street
20                           New York, New York 10017

21
                             JOHN P. McNABOE, ESQ.
22                           Heidell Pittoni Murphy & Bach, LLP
                             1050 Franklin Avenue
23                           Garden City, New York 11530

24

25

Stephanie Picozzi, OCR, RPR                                    2

1    Official Court Reporter:            Stephanie Picozzi, RPR
     Ph. (631) 712-6104                  100 Federal Plaza
2    Fax (631) 712-6121                  Central Islip, New York 11722

3

4            Proceedings recorded by computerized stenography.
                  Transcript produced by CAT.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1          THE CLERK:  09-CV-1751 Bryant, et al. v.

2   Milhorat, et al.

3          MR. GOLDSMITH:  Lee Goldsmith of Goldsmith,

4   Ctorides & Rodriguez for the plaintiffs, with Mr. Gene

5   Locks of the Locks Law Firm, Ms. Christina Ctorides of my

6   firm and Mr. Knowlton from the Locks Law Firm.

7          MR. SOLA:  Anthony Sola from Martin Clearwater &

8   Bell for all defendants except Dr. Roonprapunt (ph).  With

9   me is Nancy Block and Rosaleen McCrory.

10          MR. McNABOE:  John McNaboe, Heidell Pittoni

11   Murphy & Bach.

12          THE COURT:  As far as disclosure of the original

13   medical records of all potential 64 or 54, all claimants,

14   you have already drafted the authorizations or you have

15   already forwarded --

16          MR. GOLDSMITH:  All authorizations have been

17   forwarded, as far as I know, on all claims we have filed

18   as well as claims that we are planning to file.

19          THE COURT:  I would ask you by the end of today

20   to go over your potential claimant list, make certain that

21   all authorizations have indeed been sent to them and then

22   the defendants will have six weeks to produce the original

23   records for you.

24          MR. SOLA:  I presume they want copies first,

25   then they want a period at the end of the six weeks in

4

1   which they can come to our office to review the originals.

2   I presume we will not return the originals over to them.

3          MR. GOLDSMITH:  That's fine.  I will provide to

4   Mr. Sola a list of what we are missing in other records.

5   But we do know that we have been denied access to certain

6   records which has been -- Mr. Sola has been advised of

7   such as billing records.

8          MR. SOLA:  Let me be clear about this.  We have

9   made it clear to them that on those cases they have not

10  yet brought a lawsuit, they are only investigating to see

11  whether or not there is merit, that it is inappropriate to

12  give them billing records.  Billing records have nothing

13  to do with their analysis whether or not there are

14  departures and causation of injury.  Once they are in

15  suit, of course then, pursuant to normal discovery, they

16  would get billing records.

17         THE COURT:  Your response?

18         MR. GOLDSMITH:  We had --

19         THE COURT:  What is the importance of the

20  billing records?

21         MR. GOLDSMITH:  The billing records have shown

22  and we will be following one additional discovery, the

23  surgeons saying they were present at the surgery are not

24  the ones billing for the surgery.

25         THE COURT:  What does that have to do with the

5

1   untethering claims?

2           MR. GOLDSMITH:  It may be Drs. Milhorat and

3   Bolognese are the ones billing for the tethering but not

4   doing the tethering.

5           THE COURT:  We are only talking about the

6   untethering or is this going to the common law fraud?

7           MR. GOLDSMITH:  It goes to the common law fraud

8   and the entire case.  But the question of billing, the

9   question of billing records came up before your Honor

10  isolated the untethering.

11          THE COURT:  Would you agree that now having

12  isolated the untethering claims, the billing records are

13  not necessarily appropriate for the other 40 unless you

14  are certain they are going to be claimants?

15          MR. GOLDSMITH:  The answer to that is yes, I

16  would agree.

17          THE COURT:  Let's put it this way.  They have

18  six weeks to give you the records, then you will go to

19  their offices and go over the originals.  When you have

20  made a certification as to which claimant will actually be

21  part of this suit as far as at least the untethering

22  claims for my purposes, you will then notify the

23  defendants and they will in fact give you the billing

24  records.  Yes?

25          MR. SOLA:  That's fine.

6

1       THE COURT:  Let's set up a time period for that.

2       MR. SOLA:  I presume we are talking about six

3   weeks to give them the copies and make available to them

4   the originals from the date they give us -- that we

5   receive a list of cases.

6       THE COURT:  Yes, of course.

7       MR. GOLDSMITH:  There is other information that

8   will relate to the tethering claims that we have not

9   received.

10      THE COURT:  Give me an idea.

11      MR. GOLDSMITH:  We know that there are extensive

12  e-mails between many of our patients and many -- and the

13  defendants.  They relate to the procedures that were done

14  and recommendations relating to the procedures.

15      THE COURT:  These predate the surgeries?

16      MR. GOLDSMITH:  And yes, and postdate.  They pre

17  and postdate the surgeries.  There are multiple e-mails we

18  have received, some from our clients who retained the

19  e-mails but received none of these e-mails from the

20  defendants.

21      THE COURT:  You requested them?

22      MR. GOLDSMITH:  We requested the entire medical

23  records relating to these patients.

24      THE COURT:  I wouldn't necessarily categorize

25  those as medical records.  And I would say this, first of

7

1   all, I'm going to caution the defendants to hold on to all

2   of the computer records and so forth because you don't

3   want to be charged with expoliation and let's then get a

4   list from your clients as to e-mails and then we can match

5   them up with what they have.

6          MR. SOLA:  This goes to discovery, of course,

7   which I would presume will occur after we have answered

8   and after we have had an appearance before Magistrate

9   Judge Tomlinson.

10          THE COURT:  Correct.  I'm trying to sort of

11   expedite things.  I think we have to do this in an orderly

12   fashion.  It's going to be a big deal.  So I think we have

13   to make it as simple and as step-by-step as we possibly

14   can.

15          Are we clear now, it's six weeks they have to

16   respond from the date you get them the whole list.

17          MR. SOLA:  Just the medical records?

18          THE COURT:  The medical records.

19          They are also going to give you a list of e-mail

20   things but you can do that with Judge Tomlinson.  You

21   don't need me for that.

22          MR. GOLDSMITH:  Yes.

23          THE COURT:  Let's go on then.

24          Objection 1.  Now, the plaintiffs have listed

25   three questions that they want to be resolved as far as an

8

1    initial determination with regard to the following central

2    issues.  One was tether cord surgery and acceptable

3    scientifically supported treatment.

4            Would you agree that's an issue to be revolved?

5            MR. SOLA:  I object.  No, that is not something

6    which is specifically stated in their complaints.  This is

7    muddling.  And with all due respect to plaintiff's counsel

8    which is muddling the issues, the specific allegation,

9    factual allegation, which your Honor culled from the

10   preliminary statement is what they said, experimental.

11           THE COURT:  But are we not --

12           MR. SOLA:  That then becomes, your Honor, a

13   classic malpractice case, not acceptable, then you get

14   departures and case specific.

15           THE COURT:  I can't quite totally agree with

16   that because isn't the question of experimental one of

17   scientific acceptance or not?  If something is not

18   scientifically accepted, can't we say it's experimental?

19           MR. SOLA:  With all due respect, actually, no.

20           THE COURT:  Don't keep saying "with all due

21   respect."  It's understood.

22           MR. SOLA:  I apologize.

23           This is one of those issues, the definition of

24   experimental, which on its face seems easy, when you get

25   down into it and drilling down into it, it's actually very

9

1    complicated, what experimental is and what it is not.

2         If you are looking at the issues as he couched

3    it, whether or not it was a deviation from accepted

4    practice, then it's very case specific and you have to get

5    into the individual patient's background.

6         THE COURT:  No.  I disagree.  I think the

7    question is obviously -- that's a question of general

8    medical malpractice.  If a particular patient was advised

9    to have a particular surgery and it wasn't appropriate for

10   that person's case, that's medical malpractice.  But if

11   the whole procedure, which I believe plaintiffs are

12   claiming, had no scientific foundation for being applied

13   in any case, then it's experimental.

14        MR. SOLA:  That's why the issue should be

15   experimental.  I suggest that the whole point of this is

16   to make a few issues as possible, to consolidate it to as

17   narrow an area as possible.

18        THE COURT:  I want to hear the specific

19   objection to question 1 as formulated by the plaintiffs,

20   what you object to because to me that's saying is it

21   experimental and they say was tethered cord surgery an

22   acceptable scientifically supportable treatment.

23        MR. SOLA:  It subsumes experimental,

24   Experimental covers that as well then.  So phrase the

25   question the way it was in their complaint which is was

10

1   this experimental surgery.  That's the question.

2          THE COURT:  Do you agree if it was not

3   scientifically acceptable, then it was experimental?

4          MR. SOLA:  I really am not prepared at this

5   point based upon what I have read already on how difficult

6   it is to define experimental to give an answer to that

7   question, your Honor.

8          THE COURT:  To me this is the definition; if

9   it's not acceptable, it's experimental.

10         MR. SOLA:  I'm not quite sure I feel comfortable

11  at this point saying yes or no.  But I have no problem

12  with what was stated in the complaint, the allegation,

13  that it be experimental, that that be the issue, that that

14  be the framed issue.

15         THE COURT:  I can't let it be if I'm deciding 40

16  cases at once or more whether it was experimental as to an

17  individual person.  It can only be whether in any case it

18  would be scientifically acceptable.

19         MR. SOLA:  We agree that -- but what you are

20  doing by taking that language of plaintiff's counsel, you

21  are beginning to come up with a definition of

22  experimental.

23         THE COURT:  I think it's one factor.

24         MR. SOLA:  It may be a factor but it's not

25  exclusive.  I think a lot of this trial will be about the

11

1   definition of what is experimental.

2           THE COURT:  I think you will have an opportunity

3   to add other questions that may lead to the determination

4   as to whether something is experimental or not but

5   certainly this is one thing to be considered.

6           MR. SOLA:  I am not prepared to agree with that

7   statement, especially when that is not a specific

8   allegation in their complaint as written so far.

9           THE COURT:  I'm not concerned about that because

10  complaints by the time we get to trial may have a very

11  different -- the whole case may have a different outlook.

12          MR. SOLA:  The question of whether it's

13  experimental is one that clearly cuts across all the

14  cases.  So if the issue is framed --

15          THE COURT:  Does it?

16          MR. SOLA:  Their allegation is it's experimental

17  and we don't disagree that that is their allegation and

18  it's their allegations.

19          THE COURT:  How do you determine if something is

20  experimental?  What would you consider?

21          MR. SOLA:  That is going to be the subject of

22  expert testimony and commentary, as to the definition of

23  experimental in surgical practice.  There is going to be a

24  lot of time for debating that at trial.

25              I don't it's appropriate for me at this point to

12

1  come up with what my sort of general concept of

2  experimental might be.  I don't think it's relevant.

3          The issue is -- there is no question in every

4  single one of his complaints in the preliminary statement

5  he claims factually it was experimental.  That is an

6  appropriate issue to cull out to streamline for the jury.

7          THE COURT:  You made your point.  But I think

8  that this is definitely at the very least a factor,

9  whether it was a scientifically acceptable supportable

10 treatment for this condition.

11         MR. SOLA:  So I'm clear on the record, I think

12 that that if the Court is now going to define

13 experimental, I don't think that's a function for the

14 Court.  I think it's a subject of expert testimony and

15 will be ultimately a jury question.  So I don't think --

16         THE COURT:  And the question is going to be --

17 one of the questions is going to be was it scientifically

18 supportable for this.  So I definitely think it's a

19 factor.  There may be other factors, I certainly agree

20 with that, but I certainly think this is one and it will

21 be a question that that will have to be addressed.

22         You are telling me it will be addressed because

23 you are saying you are going to be bringing in experts who

24 will testify this was indeed an acceptable scientific

25 approach.

13

1           MR. SOLA:  We have to first decide what the

2  issue is before we decide what experts we are bringing in.

3           THE COURT:  Whether it was experimental or not.

4           MR. SOLA:  I agree that should be the issue, is

5  it experimental.

6           THE COURT:  This will definitely be a

7  consideration.  You have your exception but it's

8  definitely going to come into it.

9           Their second question is, was it a deviation

10  from accepted standards of medical care to perform

11  tethered cord surgery in any patient.  Now, that I

12  disagree with because to me, that is a question that is

13  very patient specific so I would definitely take that

14  question out.  I don't think that's appropriate for this

15  determination.

16           MR. GOLDSMITH:  Your Honor, that question can

17  easily be modified by removing "any patient."

18           THE COURT:  I don't think that that takes care

19  of it because then the question is --

20           MR. GOLDSMITH:  Generally.

21           THE COURT:  You can't speak generally.

22           MR. GOLDSMITH:  Your Honor, the initial order

23  took a look at the 14 cases and separated those 14.  In

24  those 14 cases, we basically have in those cases, I know

25  them fairly well factually individually, all the various

14

1    varieties of their claims of performing tethered cord

2    surgery and the reasons for performing as they published

3    in the literature.  Those 14 cases and my response here in

4    a patient in general, not a specific patient, but in a

5    patient at all generally --

6           THE COURT:  It has to be a specific patient.

7    Every patient -- supposing someone has a pacemaker, it

8    might enter into it or if someone has other medical -- I

9    don't know what's the plural is of apparatus.

10          MR. GOLDSMITH:  The materials.  And that goes

11   into discovery, obviously, but the materials that they

12   have written on, the subject clearly delineates their

13   reasoning for --

14          THE COURT:  Who is "they"?

15          MR. GOLDSMITH:  Dr. Milhorat in one of his

16   publications and the other author.  So I have read all

17   their materials.

18          THE COURT:  I'm still not convinced.

19          Go ahead.

20          MR. GOLDSMITH:  So I'm referring to that.

21          In trying to formulate this question, I did not

22   mean in the sense of the specific patient but the Chiari

23   patient.

24          THE COURT:  People have other things.  To me

25   this goes to your malpractice claims.  I don't want that

15

1   to be decided here.  But you have your exception.

2            Now we are one for one.

3            Number 3, the defendants' website, their

4   advertising and activities.  Well, that goes to the common

5   law fraud claim.

6            MR. SOLA:  In part.

7            MR. GOLDSMITH:  In part.

8            MR. SOLA:  Yes.

9            THE COURT:  Do you have a problem?

10           MR. SOLA:  Yes.  That gets to our motion.  I

11  submit the motion on the common law fraud is a pure

12  factual -- not factual, legal issue.  We are assuming for

13  the purposes of that motion all the allegations of the

14  plaintiff's complaint, we submit that should be decided

15  just as a matter of law before we get into wasting time

16  with discovery, wasting time if we prevail, as we believe

17  we would on the law.  There would be no point in having

18  discovery.

19           THE COURT:  Let's take the scenario that you

20  don't make such a motion or on the common law fraud so it

21  will be there and if you make your motion and the motion

22  is decided, then that will take out --

23           MR. SOLA:  Your Honor, if we are looking at the

24  basic purpose of this, to streamline and speed things up,

25  if we do the motion first as opposed to afterwards, we

16

1   save all that discovery.

2          THE COURT:  I'm going to probably refer that to

3   Judge Tomlinson so I will leave it to her whether or not

4   she wants to deal with -- how she wants to deal with it.

5          MR. SOLA:  With the pre answer motion for the

6   fraud?

7          THE COURT:  Correct.

8          MR. SOLA:  However, getting back to the main

9   purpose of this whole consolidation, I suggest as we

10  indicated in our initial response that the outcome of the

11  first critical issue here will pretty much tell the story

12  for a lot of the cases and will expedite things.  This is

13  an unnecessary one.  If for example a jury finds the

14  defendants have been engaging in experimental surgery, my

15  clients will probably have to rethink what their position

16  is.  Similarly, if the jury finds it was not experimental,

17  the plaintiffs will have to rethink.  I think this adds

18  another whole layer of discovery, a tremendous amount of

19  discovery and litigation.

20         THE COURT:  Well, you have your motion out

21  there, right?

22         MR. SOLA:  This is not just common law fraud.

23  It also goes to false advertising, a separate cause of

24  action under the New York State general business law.

25         THE COURT:  Where are you with the motion?

17

1          MR. SOLA:  We made them on those cases we are

2     allowed to.  We have asked for the judge's permission to

3     make them in the cases where they don't want the motion.

4          THE COURT:  Has the opposition been served?

5          MR. SOLA:  Yes.

6          THE COURT:  They are fully briefed?

7          MR. SOLA:  No; they have not responded yet.

8          THE COURT:  That's what I said.  Is there

9     opposition?

10         MR. GOLDSMITH:  No.

11         THE COURT:  I just said, you made the motions?

12         MR. SOLA:  We made the motions.

13         THE COURT:  Have you opposed the motions yet?

14         MR. GOLDSMITH:  No.

15         THE COURT:  When is your opposition due?

16         MR. GOLDSMITH:  In some of the cases plaintiff's

17    opposition has gone in.  In your Honor's initial ruling,

18    we were of the opinion the motions had been stayed in all

19    the cases and so there is a question in our mind what do

20    we do with these motions, when are their answers due.  We

21    are in limbo on that at this point in time so we don't

22    know.

23         MR. SOLA:  I misspoke when I said there was no

24    opposition.  There is some opposition.

25         THE COURT:  Let me ask you this, will the

18

1  determination of whether or not this procedure, the

2  untethering, is experimental be a factor in determining

3  whether there has been misrepresentation?

4          MR. GOLDSMITH:  I would think.

5          MR. SOLA:  Not relevant to the common law fraud.

6          MR. GOLDSMITH:  If your Honor goes with the

7  initial question which is accepted which I basically look

8  at as a Dalbert type of question --

9          THE COURT:  So do I.

10          MR. GOLDSMITH:  -- the answer to that is no,

11  because if that question gets resolved, then it can be

12  placed in with the questions of the common law fraud or

13  the other questions.  So from a scientific point of view,

14  the answer from plaintiff is no.

15          THE COURT:  See, I don't know because it would

16  seem to me if there is no scientific basis for this type

17  of surgery then and they were aware of it, then that leads

18  into the determination of whether there was common law

19  fraud.

20          MR. GOLDSMITH:  Tell me why not.

21          MR. SOLA:  That's the basis for our motion.

22          THE COURT:  You agree on this?

23          MR. GOLDSMITH:  No.

24          MR. SOLA:  Common law fraud, your Honor, cannot

25  reside together with a medical malpractice case.  You have

19

1  to have separate and distinct -- it's strictly a matter of

2  law they cannot seek a common law fraud in a case like

3  this.

4          THE COURT:  Why is this?

5          MR. SOLA:  It's in our briefs.

6          THE COURT:  I haven't read them yet.

7          MR. SOLA:  Because basically for common law

8  fraud to exist with medical malpractice, the fraud has to

9  be distinct, rather, the damages have to be distinct and

10  separate from the medical malpractice.  And we had almost

11  the exact same case in the Eastern District a year or two

12  ago.  The exact same issue was decided and there is a long

13  line of cases indicating that you cannot have common law

14  fraud together with medical malpractice in a case such as

15  this.

16          THE COURT:  I think you should respond to the

17  motion and we will see whether the determination of that

18  motion will be held in abeyance or not and I will look at

19  the papers and see, when I have seen everything there,

20  whether I think it should be or not.  I'm sorry if you

21  think it wastes time.  I can't see doing it any other way.

22          MR. SOLA:  My only point, we have 14 different

23  cases in front of a lot of different judges on this

24  motion.  Perhaps what would be appropriate, we might both

25  agree to have that motion heard before one judge for all

20

1   the cases.

2           THE COURT:  You want me to take that part too?

3   I have no problem with that.

4           MR. GOLDSMITH:  We have no objection to that.

5           THE COURT:  That's fine.

6           Off the record.

7           (A discussion was held off the record.)

8           THE COURT:  I'm going to ask you at the end of

9   the day here, hopefully we won't go to the end of the day,

10  when we are done, if you would formalize a new order.

11          MR. SOLA:  Proposed order to submit?

12          THE COURT:  Proposed order to submit.

13          I will do those two, 1 and 3.  Let's move along

14  then.

15          MR. SOLA:  You said 1 and 3.  I thought we were

16  disputing 3 was not going to be included now.

17          THE COURT:  It's not going to be included.  It's

18  a separate motion but I will decide it.  I wouldn't

19  include it in the order.  I'm taking that away from the

20  other cases.

21          MR. SOLA:  Understood.

22          THE COURT:  Now, I have already told you that I

23  do think that all 40 should be decided together as to

24  these issues so while you have your objection and your

25  exception, win a few, lose a few.

21

1        MR. GOLDSMITH:  It's no objection.  It's no

2    exception, your Honor.  We will comply.

3        THE COURT:  Objection number 3.

4        MR. SOLA:  For clarity on that point, are you

5    going to set a time frame within which for them to file?

6        THE COURT:  How long do you need to file

7    opposition to the motion?  This is on the fraud.

8        MS. CTORIDES:  Some of the affirmations in

9    opposition have already been submitted.

10        THE COURT:  We have to get out the order.  The

11    first step is to get out the order so I get those from the

12    other judges.

13        Can you work that out?

14        MR. SOLA:  Yes.  What I was talking about, the

15    time in which they have to file the 40 odd cases.

16        THE COURT:  If they don't want to file certain

17    of the cases after they have gone over the records, they

18    don't have to.  Let's give them four months.

19        Is four months enough?

20        You have six weeks to go through the records and

21    then another four months from then or three months from

22    then.

23        MR. LOCKS:  There are two issues.  Every case

24    has to be reviewed by and will be reviewed by what we

25    consider to be legitimate physicians to give us an opinion

22

1   on that case.  There are only a certain number of

2   physicians we are at the point now --

3           THE COURT:  How much time do you need?

4           MR. GOLDSMITH:  Your Honor, I will move as

5   expeditiously as I can.

6           THE COURT:  How much time do you need?

7           MR. GOLDSMITH:  I will need at least the four

8   months.  I may come back and request additional time.

9           THE COURT:  Fine.

10          MR. GOLDSMITH:  I can't be better than that.

11          THE COURT:  That's fine.

12          MR. LOCKS:  There is a moving target.  Some of

13  these may for some reason require a little additional time

14  and for some reason --

15          THE COURT:  Let us know.  You think the

16  defendants are in a rush to get to trial?

17          MR. LOCKS:  There may be some new people.

18          THE COURT:  I have yet to meet the defendant who

19  is in a hurry.

20          Number 3, no one wants to, least of all myself,

21  consolidate these cases in toto.  That was never an issue.

22          Objection 4.

23          MR. SOLA:  On plaintiff's question 4 --

24          THE COURT:  I think we are in agreement that the

25  whole question to be decided initially is was this

23

1    experimental, that's it.

2            MR. SOLA:  That's not a determination of

3    liability.

4            THE COURT:  Certainly not.

5            MR. SOLA:  The trial would have to resume for

6    each individual case, both liability and damages.

7            THE COURT:  And with each individual judge as to

8    medical malpractice.

9            MR. SOLA:  Discovery for each one of those as

10   well.

11           THE COURT:  Absolutely.

12           MR. SOLA:  Understood.

13           THE COURT:  You can always make your motions.

14           As far as objection 6 -- what happened to 5?

15           MR. SOLA:  We have no objection to that.

16           THE COURT:  We are all in agreement I will do --

17   someone, probably me, will do the pretrial discovery for

18   all the cases.  Well, let's see what happens with the

19   initial first.  Let's see what happens.  If we weed out

20   some and then, you know, it may be I will take them for

21   the trials.  I don't know.  We will see what is left.

22           Number 6.

23           MR. SOLA:  All cases will be stayed for the time

24   period they file.

25           THE COURT:  Absolutely.  Plaintiffs do not

24

1     object to the stay of the other causes of action.

2     Defendants vehemently object.  You can always move.

3                 MR. SOLA:  Which one?

4                 THE COURT:  Number 6.

5                 MR. SOLA:  We have addressed that we are going

6     to be able to make our single common law motion.

7                 THE COURT:  That's fine.

8                 We are up to number 7.  I think you are in

9     agreement.

10                MR. GOLDSMITH:  We are.

11                MR. SOLA:  Yes.

12                THE COURT:  Let's do 8 and 9.

13                MR. SOLA:  8 I think we have taken care of.

14                MR. GOLDSMITH:  8 we have taken care of.

15                THE COURT:  And 11.

16                MR. GOLDSMITH:  That's the common law fraud.

17                THE COURT:  We have decided that.

18                MR. SOLA:  Can we go back to number 3?  That was

19    our issue about at trial, selecting or a severed single

20    issue which cuts across all the cases.  We are just

21    raising it now.  You may want to rule at a later time.

22                THE COURT:  Please direct me.

23                MR. SOLA:  Number 3 where we raise the issue

24    that --

25                THE COURT:  Consolidating everything.

25

1        MR. SOLA:  At the severed trial of the single

2    issue of the untethering, not all plaintiffs in 50 cases

3    be allowed to be in the courtroom during the trial during

4    the trial of that action.

5        THE COURT:  Let's wait and see when we get to

6    the trial.  Why wouldn't they be allowed here?

7        MR. SOLA:  We agree they shouldn't be allowed.

8        THE COURT:  Why wouldn't they be allowed?

9        MR. SOLA:  It's a single issue that cuts across

10   all the cases.  It would be a terrible impression to the

11   jury if they see 50 plaintiffs on the one issue.  It's

12   prejudicial and their individual cases are irrelevant to

13   that issue.  It should be a single representative person.

14   It's not consolidated.

15       THE COURT:  You will have to brief that.

16       MR. SOLA:  It's not a class action.

17       THE COURT:  You will have to brief that.  I'm

18   not inclined to -- if this is an issue that's relevant to

19   anyone's claim, I'm not inclined to foreclose them from

20   listening to what is going on.  This is an open courtroom.

21       MR. SOLA:  We can have people from the defense

22   side here too as long as it's in the open courtroom

23   setting.  They can sit in the background.  But the jury

24   should not be told.  This is the exception that lists all

25   50 names.  That would be inappropriate I would submit.

26

1          MR. GOLDSMITH:  Isn't it premature?

2          THE COURT:  I think.

3          MR. SOLA:  I mentioned it at the beginning

4    because it may be something to handle at a later date.

5          THE COURT:  You have noted it.  We know it's on

6    the horizon but I'm going to need some law on that issue,

7    for prejudice and so forth.

8          Anything else?

9          MR. GOLDSMITH:  One other, just a thought.  No

10   answers have been filed in any of these cases because of

11   the pending motions.  I will assume that pursuant to

12   briefing schedule, the answers will be due immediately

13   thereafter, after the motions are decided.

14         MR. SOLA:  Whichever judge or your Honor decides

15   that will indicate when the answers are due.

16         THE COURT:  That's generally the way it works.

17         MR. SOLA:  May I then add, your Honor, that

18   Magistrate Judge Tomlinson set a discovery conference for

19   the 15th, we haven't answered yet.  We now have this

20   motion that is going to go first.  I would think that

21   would be basically pointless at this point to have that.

22         THE COURT:  The conference?

23         MR. SOLA:  Where we will have a delay.

24         THE COURT:  We can contact her.

25         MR. GOLDSMITH:  Your Honor, I don't see it as

27

1    pointless.  Your Honor has decided to follow basically

2    question 1 and we could have that conference.  We prepared

3    for the conference.

4              THE COURT:  Just as to question 1?

5              MR. GOLDSMITH:  Just as to question 1.

6              THE COURT:  I have already laid out your

7    discovery, the hospital records.  What else do you need?

8    You need depositions?

9              MR. GOLDSMITH:  Yes.

10             THE COURT:  Then you are going to have to go to

11   her.  Let's give her an encapsulated order to determine

12   discovery in the case but only on the question of whether

13   or not -- unless the surgery was experimental, only on

14   that issue, discovery will proceed and I will send it to

15   her for that purpose.

16             What did you want to say?

17             MR. SOLA:  Okay.  Because we have to submit to

18   you a proposed order here now.

19             THE COURT:  The order comes first.  We can't do

20   anything without the order.

21             MR. SOLA:  That's not going to happen, I would

22   think, getting it to you and getting your response by the

23   15th.

24             THE COURT:  All right.  I see.  We can delay.

25   Let's call Judge Tomlinson and ask her, Bryan, if we can

28

1   adjourn it.  But you will get it to me soon, an order.

2           MR. SOLA:  Proposed order to you.  A week to get

3   it to you?

4           THE COURT:  Sure.  The week brings us to the

5   15th just about.  Make it right after the New Year.

6           Does that work?

7           MR. GOLDSMITH:  That's fine.

8           In this proposed order, may we quote question 1

9   from the plaintiff?

10          THE COURT:  Including but not limited to.

11          MR. GOLDSMITH:  Tethered cord.

12          THE COURT:  Included but not limited to.

13          MR. SOLA:  Now I'm not following.

14          THE COURT:  Experimental, the question -- the

15  issue will be including whether.

16          MR. SOLA:  But not limited to.

17          THE COURT:  Their number 1.  Then you can add

18  other things.  Send it back and forth and knock each

19  other's heads.  Hopefully by the time you get to Judge

20  Tomlinson, you will have an order I have signed that will

21  give her an idea of what I'm asking her to do.

22          Okay?

23          MR. GOLDSMITH:  Thank you.

24          THE COURT:  Have a great day and fabulous

25  Christmas.

29

1          MR. LOCKS:  Do we have to confer with Judge

2     Tomlinson?  Is the 15th off?

3          THE COURT:  We will confer.

4          MR. SOLA:  One thing my colleague pointed out.

5     Her discovery order on things like e-mails, etcetera, is

6     going to be pointless until we have all the cases filed.

7          THE COURT:  You can start them.

8          Look, you can't use the e-mails from a case

9     that's not filed in another case, that's clear.  So I

10    think -- gosh, the temptation is there when you see an

11    e-mail but that case isn't filed so let's only do it for

12    the cases that are filed.  I don't want any random e-mails

13    out there floating around from other.

14         MR. SOLA:  They won't be relevant to this issue.

15         THE COURT:  They may or may not be.  I don't

16    want someone's personal e-mail to be utilized in a way

17    that doesn't affect a particular cause of action for them.

18         MR. GOLDSMITH:  To expedite matters, we have

19    authorizations and have supplied authorizations rather

20    than saying just the cases filed, the cases in which

21    authorizations have been supplied to the defendants.

22         THE COURT:  Does that work?

23         MR. SOLA:  Sorry, I missed that.

24         THE COURT:  The e-mails for the cases for which

25    authorizations have been issued.

30

1          MR. SOLA:  There are different defendants.  They

2     don't have the same defendants in every case.  There are

3     some that are the same.

4          THE COURT:  You will have to --

5          MR. SOLA:  This is really not doing it in a

6     procedurally, orderly way.  First you have a complaint,

7     then an answer, then you have discovery conference.  There

8     is a reason for that.

9          THE COURT:  We are trying to expedite.

10         MR. SOLA:  I understand that.

11         THE COURT:  I'm wondering how would the e-mails

12    be relevant to the question of whether it's experimental?

13         MR. GOLDSMITH:  If the e-mail showed the doctor

14    said it's part of an experiment, it becomes very relevant.

15    We will be able to present testimony to that effect, your

16    Honor.

17         THE COURT:  E-mails that --

18         MR. GOLDSMITH:  The doctor said it's an

19    experimental procedure.

20         THE COURT:  Well, that would definitely be

21    relevant.  How are you going to tailor the request?

22         MR. GOLDSMITH:  For e-mails?

23         THE COURT:  As opposed to every e-mail that was

24    sent by every defendant to your client.

25         MR. GOLDSMITH:  Well, the way we have seen the

31

1    e-mails we have gotten from our clients, they all come

2    from the Chiari Institute and should be part of the record

3    for the individual patient.

4              THE COURT:  So it would be in that complete

5    record?

6              MR. GOLDSMITH:  Should be part of their record

7    or maintained under separate file.

8              THE COURT:  I don't know if that's maintained as

9    a medical record.

10             MR. GOLDSMITH:  I have never seen as many

11   e-mails in my life from any medical source that I have

12   from this institute.  But I'm saying if it's done as we do

13   in a law office, every e-mail is associated with a

14   specific file.

15             THE COURT:  Of course.  But the question is is

16   it relevant in the medical file to put an e-mail.  Do

17   e-mails go into medical files?

18             MR. SOLA:  There is no rule in medical

19   recordkeeping about putting e-mails.

20             THE COURT:  Where are they kept?  Are they kept

21   in a separate file or you don't know?

22             MR. SOLA:  Don't know.

23             THE COURT:  Find out if they are in the medical

24   files; it's part of what they get.

25             MR. SOLA:  We'll turn whatever we have in the

32

1    medical chart and turn over.

2            THE COURT:  Not the medical chart.  If it's in

3    the patient's medical file.

4            MR. SOLA:  I'm using that term interchangeable.

5            THE COURT:  You are all officers of the Court.

6    I think when they come over and look at the original files

7    -- I would say this.  Don't send the e-mails with the

8    initial records but when they come to your offices to see

9    the medical records, have those e-mails there so that you

10   are all there, you all see them and you can go through

11   them and see which ones would be relevant to this

12   particular issue and you can go through them that way.

13   That's fair.

14           Have a great day.  Great holidays.  Happy New

15   Year.

16           (The conference was concluded.)

17

18

19

20

21

22

23

24

25