UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

K.B., by and through her parents and natural
guardians, APRIL BRYANT and WAYNE
BRYANT, and APRIL BRYANT, Individually, and
WAYNE BRYANT, Individually,

Index No. CV-09-1751

**ATTORNEY'S
AFFIDAVIT**

Plaintiffs,

-against-

THOMAS H. MILHORAT, M.D., PAOLO A.
BOLOGNESE, M.D., MISAO NISHIKAWA, M.D.,
L. THIERRY REMY, M.D., CHANLAND
ROONPRAPUNT, M.D., NORTH SHORE - LONG
ISLAND JEWISH HEALTH SYSTEM, INC., THE
CHIARI INSTITUTE, an unincorporated entity of
North Shore University Hospital, and HARVEY
CUSHING INSTITUTES OF NEUROSCIENCE, an
unincorporated entity of North Shore University
Hospital,

Defendants.
-----------------------------------------------------------------X

STATE OF NEW YORK      )
                       : ss.:
COUNTY OF NEW YORK  )

     1.     I am a member of the law firm of GOLDSMITH, CTORIDES & RODRIGUEZ,

L.L.P., attorneys for the Plaintiffs, K.B., APRIL BRYANT and WAYNE BRYANT.

     2.     This Affidavit is submitted in support of the Petition of APRIL BRYANT and

WAYNE BRYANT to settle the claim of the infant Plaintiff, K.B. pursuant to Local Civil Rule

83.2 and CPLR §1208.

     3.     .As required by Local Civil Rule 6.1(d), your affiant sets forth the following

explanation as to why the Petition to Settle the Claim is being filed ex parte:

a. Local Civil Rule 83.2 entitled "Settlement of Actions by or on Behalf of Infants or Incompetents," states that:

"The proceeding upon an application to settle or compromise such an action shall conform, as nearly as may be, to the New York State statutes and rules, but the Court, for cause shown, may dispense with any New York State requirement."

Traditionally, in New York State Court, Infant's Compromise Petitions are filed ex parte, in the ex parte motion support office, without service of the papers on the defendants. Moreover, the compromise hearing is typically done in the absence of the defendants.

b. The defendants have already agreed to settle the case for the sum of ███

███████        ████████████████        ████

pending the Court's approval.

c. The Infant's Compromise Petition is not an adversarial proceeding. *Anderson v. SAM Airlines*, 1997 U.S. Dist. LEXIS 23634, 1997 WL 1179955 (E.D.N.Y. Apr. 25, 1997) (The submission of the compromise marks the end of the adversarial phase of the case. The parties' role changes from that of adversaries to parties with a common goal in an uncontested proceeding).

d. As is required by CPLR § 1208 both the Petition and the instant attorney's affidavit contain explanations as to why it would be in the best interest of the infant Plaintiff to accept the settlement. Given that there are still pending related "Chiari" cases, it would be disadvantageous to the remaining Plaintiffs, whose cases have not settled, for the Defendants to learn our strategies and thought processes for settling cases. Furthermore, the Defendants would gain an unfair advantage by having unfettered access to our

2

cost sheets which set forth how much money we have spent on the litigation, and the vendors and resources which we have utilized to become trial ready. This information would give the Defendants insight to attorney work product which they would otherwise not have access to, compromising the position of the Plaintiffs whose cases remain unsettled. There presently remain two (2) unsettled cases in the Chiari litigation. One is a Federal Court case (Schmieder 10-CV-01465); the other matter is venued in the Supreme Court of the State of New York, County of Nassau.

e. On January 23, 2015, your affiant advised Rosaleen McCrory, Esq. of the firm of Martin Clearwater and Bell, LLP, attorneys for the Defendants, that the Bryant application would be filed ex parte in the same manner as the two prior infant compromise petitions filed in the Chiari litigation. Counselor McCrory has been with a copy of the Proposed Infant's Compromise Order.

## INTRODUCTION

4.     This is a medical malpractice action wherein it has been claimed that NORTH SHORE-HEALTH SYSTEM, by and through its agents, servants and employees, performed unnecessary tethered cord surgery upon the infant, K.B., on April 15, 2008.

5.     On or about the 3rd day of November, 2008, the Petitioners, APRIL BRYANT and WAYNE BRYANT consulted with and retained the law offices of GOLDSMITH CTORIDES & RODRIGUEZ, L.L.P, having offices located at 750 Third Avenue, 9th Floor, New York, New York 10017, pursuant to a Retainer Agreement, which is annexed as **Exhibit "A" to the Petition to Settle the Claim,** to investigate a potential medical malpractice action relating to medical treatment rendered to their daughter, K.B. at North Shore University Hospital.

6.      On August 4, 2009, the law firm of GOLDSMITH CTORIDES & RODRIGUEZ, L.L.P. filed a Retainer Statement and was given Retainer Statement Number 3587774. (See **Exhibit "B" to the Petition to Settle the Claim)**

7.      The firm of GOLDSMITH CTORIDES & RODRIGUEZ, L.L.P. worked on this case with LOCKS LAW FIRM, P.L.L.C., and the Petitioners were advised that GOLDSMITH, CTORIDES & RODRIGUEZ, L.L.P. and LOCKS LAW FIRM, P.L.L.C. would be working together on K.B.'s behalf and sharing in the fee. (See **Exhibit "C" to the Petition to Settle the Claim)**

8.      Both the firms of GOLDSMITH, CTORIDES & RODRIGUEZ, L.L.P. and LOCKS LAW FIRM, P.L.L.C. have extensive experience in handling medical malpractice actions. This is an area of specialty for both firms. The instant action is one of fifty-six (56) similar cases commenced against the same defendants relating to the performance of same types of surgeries. Before commencing any of the actions, Lee Goldsmith, M.D. J.D., along with the team assembled to work on the cases, all of whom are attorneys with decade's worth of experience in handling medical malpractice matters, performed extensive research on Chiari Malformation, Tethered Cord Syndrome and Ehlers Danlos Syndrome. This included conducting an extensive medical literature search, reviewing hundreds of medical articles, reviewing textbook chapters relating to relevant medical topics and meeting with leading neurosurgeons and neurologists in the field to gain knowledge and information on Chiari Malformation and Tethered Cord Syndrome. It was the intention of the team to become as educated as possible about the complex neurosurgical conditions at issue, before embarking on the litigation.

9.      Relating to this specific action, the firms of GOLDSMITH, CTORIDES & RODRIGUEZ, L.L.P. and LOCKS LAW FIRM, P.L.L.C. obtained the medical records and had

4

the matter reviewed by medical experts, including, but not limited to, a pediatric neurosurgeon and a pediatric neurologist who provided the basis to proceed with the action.

10.     A Complaint was filed in the United States District Court, Eastern District of New York on the 29th day of April, 2009. A copy of the Complaint is annexed hereto as **Exhibit "D" to the Petition to Settle the Claim.** [Docket No. 1]

**BACKGROUND**

11.     The infant Plaintiff, K.B., was born with a condition known as Chiari 1 Malformation. This is a congenital brain disorder wherein the cerebellar tonsils descend out of the skull onto the spinal cord, impeding the cerebral spinal flow, and causing compression and neurologic symptoms. The most common symptoms caused by Chiari Malformation are headaches, dizziness, numbness and tingling of the extremities, and neck pain.

12.     As an infant, K.B. was a poor feeder and had gastric reflux which was treated with Zantac. She also had moderate speech delay for which she received speech therapy. Overall, she was a very happy, normal and inquisitive toddler. In January, 2008, K.B.'s life forever changed. She had been ill for about two weeks with a fever and headache, and was being treated with antibiotics for sinusitis. After jumping about in a bounce house, K.B. complained of a bad headache. Later that same day, she said that she could not see the TV screen in the car for a few seconds. The next day, while in her room, she said that the walls were blue and the ceiling was purple, although they were yellow and white respectively. APRIL and WAYNE BRYANT, parents of K.B., became quite concerned and took K.B. to the emergency room at Kootenai Medical Center in Coeur d'Alene, Idaho.

13.     The infant Plaintiff, K.B., was diagnosed with Chiari I Malformation in January, 2008 when she had a brain MRI at Kootenai Medical Center in Coeur d'Alene, Idaho which revealed a 15 mm tonsillar herniation.

14.     In the days which followed the initial brain MRI, K.B. had cervical, thoracic and lumbar MRIs which were essentially normal, but for the finding of the Chiari I Malformation. There was neither evidence of a syrinx nor evidence of tethered cord syndrome.

15.     The infant Plaintiff, K.B., was first seen by the Defendants at North Shore University Hospital's Chiari Institute on March 24, 2008. Her chief presenting complaints on that date were:

        A.     Headache;

        B.     Temporary loss of vision and color change; and

        C.     Vomiting.

        (See Defendant's initial note annexed as **Exhibit "E" to the Petition to Settle the Claim**)

16.     Defendant, PAOLO A. BOLOGNESE, M.D., recommended that the infant Plaintiff, K.B., have tethered cord surgery, a surgery on the lumbar spine. The Defendants claimed that the tethered cord surgery would allegedly improve the Chiari I Malformation in that the cerebellar tonsils would ascend upwards.

17.     The lawsuit arose because the Defendants performed unnecessary tethered cord surgery upon the infant Plaintiff on April 15, 2008. As the infant Plaintiff did not have tethered cord syndrome, the tethered cord surgery, which the Defendants performed in the region of lumbar spine at L4/L5, was not indicated. A copy of the operative report is annexed hereto as **Exhibit "F" to the Petition to Settle the Claim.**

18.     Upon returning home from the tethered cord surgery, K.B. developed fever, leukocytosis, foot pain, and back pain and was admitted to the Sacred Heart Medical Center in Spokane Washington, where on April 29, 2008 she had an MRI of the lumbar spine showing "enhancement of the nerve roots of the cauda equine likely due to mild post-operative arachnoiditis." (See **Exhibit "G" to the Petition to Settle the Claim**)

19.     On July 17, 2008, K.B. had an MRI at the Kootenai Medical Center showing a "clear syrinx from C2 through the conus." A syrinx (also called syringomyelia) is a fluid filled cyst within the spinal cord. The MRI performed on July 17, 2008 demonstrated that K.B. had a syrinx which spanned the entire length of her spinal cord.

20.     In July, 2008, K.B., began treating with Dr. Richard Ellenbogen at Seattle Children's Hospital. On July 28, 2008, he advised K.B.'s parents that K.B. needed posterior fossa decompression, the traditional Chiari brain surgery, because of the syrinx. Thus, On October 7, 2008 K.B. underwent craniectomy of the posterior fossa with a C1 laminectomy for Chiari Malformation and syringomyelia.

21.     Between October 17, 2008 and June, 2009, K.B. had numerous lumbar punctures at Seattle Children's Hospital for complaints of persistent headaches.

22.     On June 23, 2009, the lumbo peritoneal shunt was tied off as she had been having headaches indicative of over shunting. Once the lumbo peritoneal shunt was tied off in June, 2009, K.B.'s headaches improved significantly. On April 12, 2010, K.B. had the lumbo peritoneal shunt removed.

23.     Since that time, K.B.'s headaches occur less frequently and with less intensity. However, she has developed new symptoms from the unnecessary tethered cord surgery, including significant lower back pain, leg pain and tingling, as well as a jelly-like sensation in

the legs, urinary incontinence and leakage. As early as December, 2008, K.B. was complaining to the physicians at Seattle Children's Hospital that she was having difficulty ascending and descending stairs with weakness in the lower extremities. She was also noted to have trouble bending her legs with more pain in the left lower extremity.

24.    K.B. has undergone varying degrees and forms of physical therapy since the tethered cord surgery. On March 17, 2009 K.B. presented to Joshua Tree PT with complaints of cervical spinal pain, upper thoracic pain, mid back pain and low back pain. K.B. has made multiple complaints of a lower back pain, and pain and tingling in her lower extremities which often feel like jelly. Most recently, she had aquatic therapy, which has been stopped for the time being, until K.B. is assessed by a rheumatologist. Joshua Tree PT records are annexed hereto as **Exhibit "H" to the Petition to Settle the Claim.**

25.    Since the tethered cord syndrome, K.B. sometimes leaks urine after she voids, requiring her to use feminine napkins so as to avoid leaking onto her clothes. K.B.'s urinary incontinence was caused by nerve damage from the tethered cord surgery. (See IME Reports of Dr. Daniel Adler, annexed as **Exhibit "I" to the Petition to Settle the Claim**)

26.    In June, 2012, K.B. was seen by the pain management team at Seattle Children's Hospital relative to her complaints of pain. It was noted that "she is experiencing lower back pain which is located in the lumbar area as well as history of headaches which she described to be located in the temples and history of pain in her legs described as tingling pain. K.B. describes that her pain is constant and described as pins and needles and is worsened by riding in the car for long periods of time leading forward, sitting for long periods in school or standing for a long time. She reports that her back pain is generally constant as is her leg pain; however her headache is intermittent, located in the temples although occurs on an almost daily basis." The

Seattle Children's Hospital records are annexed hereto as **"Exhibit J" to the Petition to Settle the Claim.**

27.    In April, 2012, K.B. had a sleep study which revealed that she had period limb movement index disorder which can be the result of damage to the lumbo-sacral nerves and arachnoiditis. The sleep study team recommended the use of Gabapentin, a medication used to treat nerve pain. The sleep study records are annexed hereto as **"Exhibit K" to the Petition to Settle the Claim.**

28.    K.B. has been evaluated by pediatric neurologist, Dr. Dan Adler, on behalf of Plaintiff's counsel. Dr. Adler evaluated K.B. in April, 2011, when APRIL and WAYNE BRYANT, parents of K.B., came with K.B. to New York City for their depositions. Subsequently, Dr. Adler reviewed K.B.'s updated medical records and in November 2014, conducted a telephone interview with the petitioner April Bryant, resulting in his writing a follow up report regarding K.B.'s current physical status. Dr. Adler clinical impression is that K.B.'s complaints of lower back pain, bowel and bladder dysfunction and numbness in her legs are chronic in nature and that these symptoms shall require chronic pain management and medical treatment.  Copies of Dr. Adler's reports are annexed as **"Exhibit I" to the Petition to Settle the Claim.**

## PROCEDURAL HISTORY

29.    K.B.'s case against the Defendants is one of fifty-six (56) other actions filed by the Petitioners' lawyers involving similar facts and circumstances.

30.    In the Chiari litigation, the firm of Goldsmith Ctorides & Rodriguez, LLP along with the Locks Law Firm, LLP, represented forty-two (42) plaintiffs in the United States District

Court, Eastern District of New York and fourteen (14) state court plaintiffs in the New York State Supreme Court.

31.     The cases in the Federal Court were consolidated for purposes of discovery before the Honorable Magistrate Judge A. Kathleen Tomlinson.

32.     Magistrate Judge Tomlinson designated, three trial cases, namely *Bryant v. Milhorat* CV-09-1751, *Vercher v. Milhorat* CV-09-1836 and *Smith v. Milhorat* CV-09-2506. Extensive general and case specific discovery was conducted in those actions.

33. After the Plaintiffs were in deposed in all of the forty-two (42) cases filed in the Eastern District of New York, the Plaintiffs took the general depositions of the following defendants on general issues that would apply to all of the cases:

| DEPONENT | DATE OF DEPOSITION |
| --- | --- |
| Bolognese, Dr. Paolo | 7/22/2011 |
|  | 7/25/2011 |
|  | 7/29/2011 |
|  | 8/1/2011 |
|  | 9/12/2011 |
| Castano, Robert (Witness on behalf of North Shore LIJ) | 8/8/2011 |
| Chen, Dr. Xi | 8/23/2011 |
| Dlugacz, Dr. Yosef (Witness on behalf of North Shore LIJ) | 10/11/2011 |
|  | 5/8/2012 |
| Hahn, Cynthia (Witness on behalf of North Shore LIJ) | 8/15/2011 |
| Kula, Dr. Roger | 8/5/2011 |
|  | 8/9/2011 |

| | 8/10/2011 |
|---|---|
| | |
| Milhorat, Dr. Thomas | 7/14/2011 |
| | 7/15/2011 |
| | 7/18/2011 |
| | 7/19/2011 |
| | 9/9/2011 |
| | |
| Mora, Dr. Sol | 8/23/2011 |
| | |
| Nishikawa, Dr. Misao | 8/15/2011 |
| | 8/16/2011 |
| | 8/17/2011 |
| | |
| Podmore, Margaret (Witness on behalf of North Shore LIJ) | 8/22/2011 |
| | |
| Randazzo, Edward (Witness on behalf of North Shore LIJ) | 8/19/2011 |
| | |
| Remy, Dr. Ludmio | 8/12/2011 |
| | |
| Roberti, Richard (Witness on behalf of North Shore LIJ) | 9/13/2011 |
| | |
| Roonprapunt, Dr. Chan | 8/8/2011 |
| | |
| Rosalia, Stephen  (Witness on behalf of North Shore LIJ) | 8/24/2011 |
| | |
| Sellman, Elizabeth (Witness on behalf of North Shore LIJ) | 8/25/2011 |
| | |

34.     At the conclusion of the Defendants' general deposition testimony, expert reports were exchanged in the three (3) trial cases, on both general and case specific issues. In total, Plaintiffs served twelve (12) expert reports on general litigation matters.

35. After exchange of expert reports, the experts were deposed, as were numerous fact witnesses. Many of the experts, and fact witnesses, were deposed on general issues, applicable to each case in the litigation including the *Bryant* case.

36. The following expert and fact depositions took place in the three trial cases:

| DEPONENT | TYPE OF WITNESS | DATE OF DEPOSITION |
|---|---|---|
| Ausman, Dr. James | Fact Witness | 12/8/2011 |
| | | 5/1/2012 |
| Bennett, Dr. Jeffrey | Neuro Radiology Expert | 2/22/2012 |
| | | 2/23/2012 |
| | | 2/24/2012 |
| Blaivas, Dr. Jerry | PLAINTIFF'S EXPERT - Urology | 4/19/2012 |
| Bolognese, Dr. Paolo | DEFENSE EXPERT - Billing issues | 4/23/2012 |
| Cantu, Dr. Robert | PLAINTIFF EXPERT - Neurosurgeon | 3/12/2012 |
| Carter, Julie | Fact Witness | 10/18/2011 |
| Coblentz, Dr. Jay | DEFENSE EXPERT - Neurologist | 5/15/2012 |
| Ellenbogen, Dr. Richard | Fact Witness - Neurosurgeon | 11/2/2011 |
| Flannery, Dr. Ann Marie | PLAINTIFF'S EXPERT - Neurosurgeon | 2/20/2012 |
| Forem, Dr. Sandra | DEFENSE EXPERT - Neurologist | 3/30/2012 |
| Francomano, Dr. Clair | DEFENSE EXPERT - Genetics | 9/21/2011 |
| | | 4/02/2012 |

| | | |
|---|---|---|
| Freeman, Dr. Michael | PLAINTIFF'S EXPERT - Statistics | 2/21/2012 |
| Grigg, Kathleen | Fact Witness | 7/11/2011 |
| Henderson, Dr. Fraser | DEFENSE EXPERT - Neurosurgeon | 3/29/2012 |
| Katz, Dr. Stephen | Fact Witness | 11/2/2012 |
| Liebowitz, Dr. Richard | DEFENSE EXPERT – Hospital Administration | 3/14/2012 |
| Levine, Dr. Robert | DEFENSE EXPERT | 4/25/2012 |
| Levy, Dr. Howard | PLAINTIFF'S EXPERT - Genetics | 2/24/2012 |
| Long, Dr. Donlin | DEFENSE EXPERT - Neurosurgeon | 3/7/2012 |
| | | 3/8/2012 |
| Lowenthal, Dr. Steve | PLAINTIFF'S EXPERT – Hospital Administration | 2/15/2012 |
| Martin, Dr. Judith | Fact Witness | 10/13/2011 |
| Mayer, Dr. Lawrence | DEFENSE EXPERT - Epidimiology | 4/27/2012 |
| McDonnell, Dr. Nazli | Fact Witness | 1/31/2012 |
| Molofsky, Dr. Walter | PLAINTIFF'S EXPERT - Neurologist | 5/4/2012 |
| Oro, Dr. John | DEFENSE EXPERT - Neurosurgeon | 4/12/2012 |
| Perl, Dr. Daniel | DEFENSE EXPERT - Neuropathology | 3/28/2012 |

| | | |
|---|---|---|
| Phillips, Dr. Clifford Douglas | PLAINTIFF'S EXPERT – Neuro Radiology | 2/28/2012 |
| Pollock, Kim | PLAINTIFF'S EXPERT – Neurosurgical Billing | 4/17/2012 |
| Rorke-Adams, Dr. Lucy | PLAINTIFF'S EXPERT – Neuro Pathology | 2/10/2012 |
| Rosenblatt, Dr. Peter | DEFENSE EXPERT - Urology | 4/27/2012 |
| Scott, Dr. R. Michael | PLAINTIFF'S EXPERT - Neurosurgeon | 2/17/2012 |
| Skidmore, Dr. Grant | Fact Witness | 10/25/2011 |
| Stern, Dr. Jack | DEFENSE EXPERT - Neurosurgery | 4/23/2012 |
| Sutton, Dr. Leslie | PLAINTIFF'S EXPERT - Neurosurgery | 3/1/2012 |
| Sze, Dr. Gordon | DEFENSE EXPERT – Neuro Radiology | 3/5/2012 |
| | | 3/12/2012 |
| | | 3/19/2012 |
| | | 4/30/2012 |
| Ward, Dr. John | Fact Witness | 10/24/2011 |

37.     As the Court is aware, in September, 2012, Daubert Motions were submitted relative to the general experts.

38.     With regard to the case specific discovery conducted in the *Bryant* case, the parties exchanged Rule 26 Disclosures, Interrogatory Responses, and engaged in extensive

document production. The depositions of the Petitioners were held on April 12, 2011, April 13, 2011 and April 14, 2011 in New York.

39. The infant Plaintiff, K.B., was evaluated on behalf of the Defendants by pediatric neurologist, Dr. Sandra L. Forem. A copy of Dr. Forem's examination report is annexed as **Exhibit "L" to the Petition to Settle the Claim.**

40. Beginning in December, 2012, the Plaintiffs and Defendants in the Chiari/Milhorat litigation agreed to mediate the cases. Extensive negotiations and discussions were held regarding the mediation process and the confidentiality that would attach to it. Lengthy general mediation statements were submitted to the mediator to provide the background of the litigation. Moreover, lengthy confidentiality agreements were entered into. It was agreed that the settlement of any of the Chiari cases would remain completely confidential.

41. The case specific mediations began at JAMS before Mediator Ronnie Gallina, Esq. in April, 2013.

42. On May 19, 2014, this case was mediated at JAMS before Ronnie Gallina, Esq., but did not settle at that time.

43. In November, 2014, after extensive negotiations and after APRIL and WAYNE BRYANT, parents of K.B., agreed to arbitrate the case, an offer of settlement was made in the sum of ███████████████████████████████████ by Defendant North Shore LIJ-HEALTH SYSTEMS, INC.

44. The total amount of available insurance in this action amounts to $1 million primary insurance through Physicians' Reciprocal Insurers. There is also excess insurance available as set forth through in the Defendants' Rule 26 Disclosure dated August 25, 2010, a copy of which is annexed as **Exhibit "M" to the Petition to Settle the Claim.**

45.   Your affiant believes that it is in the best interest of the infant Plaintiff for her parents to accept this settlement offer, as it is it substantial, and defense counsel will have competent medical experts to defend the case on both the issues of liability and causation. It is expected that at trial, the Defendants will present testimony from a pediatric neurologist who will testify under oath, that the tethered cord surgery was indicated and necessary. It is also expected that at trial, the Defendants would present testimony from a pediatric neurologist who would say that K.B.'s headaches and chronic pain are caused by her underlying congenital Chiari malformation and not the surgeries performed by the Defendants. Furthermore, the Defendants will claim that K.B.'S lower back and lower extremity pain pre-existed the tethered cord surgery.

46.   Neither your affiant nor anyone affiliated with the law firms of GOLDSMITH, CTORIDES & RODRIGUEZ, LLP or LOCKS LAW FIRM, P.L.L.C. directly or indirectly has become interested in the settlement of the action at the instance of a party or person opposing or with interest adverse to the infant Plaintiff, K.B., APRIL BRYANT and WAYNE BRYANT, nor received nor will receive any compensation from such a party.

47.   Based on the foregoing, your affiant believes that it is in the best interests of the infant, K.B., for her parents to accept the offer of ███████████████████ ███████████████████████ as a fair and equitable settlement against the defendant North Shore-LIJ Health System, Inc. and to discontinue the action with prejudice against all other Defendants.

48.   The law firms of GOLDSMITH, CTORIDES & RODRIGUEZ, L.L.P. and LOCKS LAW FIRM, P.L.L.C. seek reimbursement for costs and expenses in the total sum of

██████████████████████████████████████████████

██████████ ; this sum is made up of both case specific costs and costs which were incurred in the prosecution of the litigation as a whole.

49.    The costs incurred specifically in connection with the infant, K.B.'s action amount to ████████████████████████████████████ ████
██████████████████ .  The case specific cost sheet is annexed as **Exhibit "N" to the Petition to Settle the Claim.**

50.    The general expenses incurred in the overall litigation amount to ████████ . The general costs include the costs associated with the initial investigation of the overall litigation, the hiring of expert witnesses in the fields of neurosurgery, neuro-radiology, pathology, epidemiology and statistics, hospital administration and neurosurgical billing, the depositions of the general experts, as well as the gathering of medical literature and general data relative to tethered cord surgery.  The overall costs of the litigation have been divided between the fifty-six (56) Plaintiffs.  K.B. is being charged $1/56^{th}$ of the general costs.  K.B.'s portion of the general costs amount to ████████████████
███████████████████  The general cost sheet is annexed as **Exhibit "O" to the Petition to Settle the Claim.**

51.    The costs which were incurred are allowable by law, are correctly stated and were necessarily incurred.

52.    After the total costs of ████████████████████
████████████ ████████████████ are deducted from the settlement of ████
██████████████████████████████ the remaining sum is

████████████████████████████████████████████

████████████████



██████ (Gross Settlement)
─ ██ (Expenses)
(Remaining sum after deduction of costs & expenses)

53.    From the sum of ████████████████████████████

████████████████████████████████████, which remains after the

expenses are deducted, GOLDSMITH, CTORIDES & RODRIGUEZ, L.L.P. and LOCKS LAW

FIRM, PLLC  are seeking a total fee for legal services in the amount of ████████

████  ██████  ████  ████  ███  ██  ████  ██████

████, calculated pursuant to the standard New York medical malpractice sliding scale fee

agreement as authorized in the Retainer Agreement:

| | | |
|---|---|---|
| on the first ████ recovered | | =$ ████ |
| on the next ████ 0 recovered | | =$ ████ |
| of the remaining ████ | | =$ ████ |
| **TOTAL ATTORNEY'S FEES** | | $ ████ |

It is understood that only one legal fee is being charged and that the total attorneys' fees of

████████████████████████████████████████

████████████  shall be equally divided between the firms of GOLDSMITH

CTORIDES & RODRIGUEZ, L.L.P. and LOCKS LAW FIRM, PLLC.

54.    Your affiant requests that this Court approve the costs and fees sought by

GOLDSMITH CTORIDES & RODRIGUEZ, L.L.P. and LOCKS LAW FIRM, P.L.L.C.

55.    After the costs and attorneys' fees are deducted from the overall settlement award,

████████  ████████████████████████  ████

████████████.

## PAYBACK OF BLUE CROSS OF IDAHO LIEN

56.    At the time of the Defendants' surgery, K.B. had health insurance through Blue

Cross of Idaho because her father, WAYNE BRYANT, worked for Reliable Electric.

57.     Upon learning of the pendency of the instant lawsuit, Blue Cross of Idaho asserted a "right of subrogation" in the amount ████████████████████████████████████████ ████████████████████████████████████, seeing reimbursement for the medical expenses paid on the infant plaintiff's behalf. (See **Exhibit "P" to the Petition to Settle the Claim**)

58.     The Horizon Blue Cross Blue Shield Plan contains a subrogation clause and states that it must be interpreted pursuant to the Laws of the State of Idaho. The laws in the State of Idaho permit insurance companies to asserts subrogation claims against the proceeds paid to plaintiffs in personal injury lawsuits. (See **Exhibit "Q" to the Petition to Settle the Claim**)

59.     Your affiant negotiated with Blue Cross of Idaho, and it was agreed that Blue Cross of Idaho's "right of subrogation" would be reduced to ████████████████████████ ████████████████████████████████████████████ (See Agreement Letter from Chasan & Walton, L.L.C., attorneys on behalf of Blue Cross of Idaho, dated January 9, 2015, annexed as **Exhibit "R" to the Petition to Settle the Claim**)

60.     Thus, it is requested that the Court permit the payment of the Blue Cross of Idaho's "right of subrogation" in the sum of ████████████████████████████████ ████████████████████████████████.

61.     After the payment of Blue Cross of Idaho's "right of subrogation," the amount of ████████████████████████████████████████████████████████ ████████████████████ remains.

## PAYBACK OF MEDICAID LIEN

62.    K.B. also has health insurance through the K.B. Beckett Program in the State of Idaho, which is a Medicaid based program set up by the Idaho Department of Health and Welfare to cover children with disabilities.

63.    The State of Idaho has asserted a lien herein in the sum of ███████ ████████████████████████████████████████████████████████. (See Exhibit "S" to the Petition to Settle the Claim)

64.    On January 16, 2015, the State of Idaho issued its final demand letter with regard to the Medicaid lien, wherein it agreed to accept the sum of ████████████ ████████████████████████████████ in full and final payment of said lien. (See Exhibit "T" to the Petition to Settle the Claim)

65.    Thus, it is requested that the Court permit the payment of the State of Idaho's reimbursement request in the sum of ████████████████████████████████ ██████████████████.

66.    After the payment of the State of Idaho's reimbursement request, the amount of ████████████████████████████████████████████████████ ████████████████████ remains.

## THE PETITIONERS HAVE ESTABLISHED THE K.B. SUPPLEMENTAL NEEDS TRUST

67.    As stated previously, the Petitioners reside along with the infant Plaintiff in the State of Idaho, County of Kootenai, and plan to remain there to be close to family and friends. The Infant Plaintiff's paternal grandparents and other extended family reside in Idaho and in the Northwest. Other than having treatment at North Shore University Hospital and The Chiari Institute, K.B. now has little contact with the State of New York.  It is anticipated that as she

grows older and requires the aid of governmental programs such as Medicaid, such benefits shall be administered by and through the State of Idaho under Idaho's law.

68.    As such, the Petitioners retained Mary W. Cusack, Esq., an attorney duly admitted to practice law in the State of Idaho, to prepare a SUPPLMENTAL NEEDS TRUST for K.B. It is anticipated that when K.B. turns 21, or when APRIL and WAYNE BRYANT, parents of K.B., are no longer able to provide health insurance to the infant Plaintiff through their employers, that K.B. will need to become a Medicaid recipient.

69.    The cost of meeting K.B.'s needs privately could exhaust her funds in a few years.

70.    Changes in the federal Medicaid Law that went into effect in 1993 as part of the Omnibus Reconciliation Action of 1993 ("OBRA 1993) specifically authorize special needs trusts as a means to preserve Medicaid Eligibility, provided that the funds remaining in the trust are available to reimburse Medicaid at the death of the Medicaid recipient. 42. U.S.C.A. §1396p(d)(4)(A).

71.    As such, the Petitioners, by an through Mary W. Cusack, Esq., filed a Petition in the District Court of the Fourth Judicial District for the State of Idaho, In and For the County of Kootenai.

72.    By Order dated **October 15, 2014**, the Idaho Court appointed, the petitioners, APRIL BRYANT and WAYNE BRYANT, as trustees of the K.B. Supplemental Needs Trust and as Guardians of K.B. (See **Exhibit "U" to the Petition to Settle the Claim**)

73.    The Idaho Court directed that any settlement proceeds owed to K.B. from the instant action be paid to the K.B. SUPPLEMENTAL NEEDS TRUST.

21

74. Your affiant agrees with the request of the Petitioners, APRIL and WAYNE BRYANT, that the sum of ███████████████████████████ ████████████████████████ be paid by the settling Defendants to the K.B. SUPPLEMENTAL NEEDS TRUST as cash benefits.

75. A copy of the SUPPLEMENTAL NEEDS TRUST document is annexed hereto as **Exhibit "V" to the Petition to Settle the Claim.**

76. The Petitioners, APRIL BRYANT and WAYNE BRYANT, as trustees of the K.B. SUPPLEMENTAL NEEDS TRUST, shall invest the money pursuant Idaho Code § 68-502, which is more commonly known as the Idaho Prudent Investor Act, a copy of which is annexed as **Exhibit "W" to the Petition to Settle the Claim.**

77. Under Idaho law, as guardians of K.B. and as trustees of her supplemental needs trust, APRIL and WAYNE BRYANT, parents of K.B., are obligated to provide yearly accountings to the Idaho Court. The Court requires that each year, on the anniversary of their appointment, the guardians complete both a Guardian Plan and Inventory. Once the financial reports are submitted, they will be reviewed by a Court auditor who will either give the accounting a "pass" or send the matter back to the Judge with questions that must be resolved.

78. The Petitioner, APRIL BRYANT and WAYNE BRYANT, shall work with Steve Nowland and Christopher Jacobs of Morgan Stanley in Spokane, Washington to develop a conservative investment strategy reasonably designed to meet K.B.'S special needs, and shall manage the TRUST in accordance with the IDAHO PRUDENT INVESTOR ACT, under the yearly supervision of the Idaho Court.

79. It is respectfully requested that his Honorable Court issue an Order directing the settling Defendant North Shore LIJ Health Systems, Inc., and their insurance company PRI to

issue a check in the sum of █████████████████████████

██████████████████████████ to the K.B. SUPPLEMENTAL NEEDS TRUST

and issue an Order transferring the oversight of the Special Needs Trust, including oversight of

the investment and expenditure of the trust funds,  to the District Court of the Fourth Judicial

District for the State of Idaho, in and for the County of Kootenai.

80.     After payment to the K.B. SUPPLEMENTAL NEEDS TRUST, the amount of

████████████████████████████████████ remains.

**IT IS REQUESTED THAT THE REMAINING SUM of█████ BE PAID TO THE
PETITIONERS IN SETTLEMENT OF THEIR CLAIM OF LOSS OF SERVICES AND
SUPPORT**

81.     The Court should note that the Petitioners' asserted a cause of action for loss

support and services in the Complaint, a copy of which is annexed as **Exhibit "E" to the
Petition to Settle the Claim.** [Docket No. 1]

82.     Moreover, by Order of the Honorable United States District Judge Sandra

Feuerstein, dated June 7, 2010, the petitioners were permitted to amend the complaint to add a

cause of action for fraud relating to financial loss incurred by the petitioners from the

Defendants' malpractice. As set forth in the Order, financial injuries to the petitioners could

include expenses incurred for travel to see Defendants, lodging near the Defendants' offices, and

out of pocket medical expenses.

83.     A Second Amended Complaint, asserting a fraud cause of action on behalf of the

petitioners, for the financial injuries suffered from the malpractice of the defendants, was filed on

the 14th day of January, 2010.  (See **Exhibit "X" to the Petition to Settle the Claim.**)

84.     It is respectfully requested that this Honorable Court, award the sum of ████

██████████████████████████, to the Petitioners in payment

23

for the settlement of their causes of action, and that Honorable court issue an Order directing the settling Defendants to pay said sum directly to the Petitioners, APRIL BRYANT and WAYNE BRYANT, upon the signing of the appropriate closing documents.

85.     The Court should note that APRIL and WAYNE BRYANT, parents of K.B., have expended large sums of money for travel related to the infant Plaintiff's medical care. APRIL and WAYNE BRYANT, parents of K.B., have traveled with the infant Plaintiff, not only to Defendant NORTH SHORE, but have also taken multiple trips to see subsequent treating physicians such as Dr. Ellenbogen at Seattle Children's Hospital. The trips to Seattle Children's Hospital continue and are expected to continue well into the future. Moreover, the Petitioners, have expended money on K.B.'S out of pocket medical costs, not covered by insurance.

86.     It is respectfully submitted to the Court that K.B.'s chronic illness and the injuries caused by the Defendants' malpractice have taken a tremendous toll on the entire family, including the family's finances. While K.B. was an inpatient at NORTH SHORE following her surgery, the petitioners, APRIL BRYANT and WAYNE BRYANT spent weeks away from their jobs essentially providing nursing services and caring for K.B. during the post-operative period. The same holds true relative to the time periods when K.B. had to be taken to see Dr. Ellenbogen at Seattle Children's Hospital. There have been many instances when the petitioners, APRIL BRYANT and WAYNE BRYANT, have lost time from work because K.B. was hospitalized at Seattle Children's Hospital or elsewhere. While K.B. has been ill, and/or hospitalized the petitioners, APRIL BRYANT and WAYNE BRYANT have acted not only as K.B.'s parents, but essentially as her nurses.

87.     The Court should note that in the year 2008 alone after K.B. had her surgery by the Defendants, the petitioners, lost much time from work resulting in a loss of income that year

24

alone of███ The loss is documented in letters obtained from the petitioners, then employer,

Reliable Electric. (See **Exhibit "Y" to the Petition to Settle the Claim**)

88.  Moreover, since the time of K.B.'s tethered cord surgery, the petitioner, April

Bryant has been unable to return to work, opting instead to be the primary caretaker for K.B.,

and to provide home schooling to K.B., who is unable to attend school and to sit at a desk for an

extended period of time due to the pain in her back.

89.  Moreover, as K.B.'s future is uncertain due to her precarious medical condition, it

is more likely than not, that APRIL and WAYNE BRYANT, parents of K.B., will not be able to

rely on K.B. for help and services to aid them as they get older.

90.  The Court should note that if Your Honor approves the payment████

████████████████████████████████ to the petitioners, it is the

petitioners' intention to utilize the money to ensure that K.B. will always have a safe and

comfortable home in which to live.

91.  It is for the reasons set forth above, that APRIL and WAYNE BRYANT, parents

of K.B., respectfully request that the sum████████████████████

████████████████ be awarded directly to them.

92.  Your affiant would like to state that during the course of the last five (5) years,

she has gotten to know APRIL and WAYNE BRYANT extremely well, having even visited their

home in Idaho. Your affiant believes that the Petitioners are excellent parents who provide a

beautiful, comforting and loving home for both of their children. Your affiant has no doubt that

any money awarded to them will be used to better the life of K.B. in every way possible.

93.  As set forth above, the parties have agreed, by entering into a confidentiality

agreement, that the settlement of this action shall be kept entirely confidential. Thus, it is

respectfully requested that any Orders which the Court may wish to issue in connection with the instant Petition, be issued under seal, so that the settlement of this matter does not become public.

94.     No previous application for the relief requested herein has been made by the petitioners or any other person.

**WHEREFORE**, it is respectfully requested that this Honorable Court under issue an Order under seal:

(a)     Granting approval for APRIL and WAYNE BRYANT, parents of K.B., to enter into the settlement negotiated with Defendant North Shore LIJ-Health System, Inc. in the sum of ██████████████████████████████████████████ and to discontinue the action against all other Defendants;

(b)     Granting APRIL and WAYNE BRYANT, parents of K.B., permission to execute the General Release and other settlement documents necessary to effect the settlement;

(c)     Approving the attorneys' fee of GOLDSMITH CTORIDES & RODRIGUEZ, L.L.P., and LOCKS LAW FIRM, PLLC in the sum of ██████████████ ███████████████████████████████████, which is to be split equally between the firms of GOLDSMITH CTORIDES & RODRIGUEZ, LLP and LOCKS LAW FIRM, PLLC and directing the settling Defendant and its insurance company to issue a check to GOLDSMITH CTORIDES & RODRIGUEZ, L.L.P. in the sum of ██████ ████████████████████████████████████████████ and a check to LOCKS LAW FIRM, PLLC in the sum of ██████ ████████████████████████████████████████████ ██████████████████

(d)     Approving the reimbursement of costs and disbursements of GOLDSMITH CTORIDES & RODRIGUEZ, L.L.P. and LOCKS LAW FIRM, PLLC in the sum of ██████ ████████ ████ ████ ████ ███ ████████ DOLLARS and directing Defendant NORTH SHORE LIJ-HEALTH SYSTEM, INC. and its insurance company/companies to issue a check to GOLDSMITH CTORIDES & RODRIGUEZ, L.L.P. and LOCKS LAW FIRM, PLLC in the sum of ███████████████████ ██████████████████.

(e)     Approving the payment of Blue Cross of Idaho's reduced "Right of Subrogation" in the sum of ██████████████████████ ███████ █████████ and directing the settling Defendant and its insurance company/companies to issue a check in that sum made payable to the Trust Account of Chasan & Walton.

(f)     Approving the payment of the State of Idaho's reimbursement request in the sum of ████████████████████████████ and directing the settling Defendant and its insurance company/companies to issue a check in that sum made payable to HMS Recovery Unit.

(g)     Directing the settling Defendant and its insurance company/companies to pay the sum ███████████████████████████ ████████████████ to the K.B. SUPPLEMENTAL NEEDS TRUST in payment of the settlement funds owed to the infant plaintiff by issuing a check made payable to the infant plaintiff's special needs trust by using the infant plaintiff's full name on the check; and

(h)     Directing the settling Defendant and its insurance company to issue a check in the sum of ███████████████████████████████ to APRIL BRYANT and WAYNE BRYANT in settlement of their claims;

(i)     Transferring the oversight of the K.B. SUPPLEMENTAL NEEDS TRUST to the District Court of the Fourth Judicial District for the State of Idaho, in and for the County of Kootenai; and

(j)     Directing the firm of GOLDSMITH CTORIDES AND RODRIGUEZ, LLP to serve a copy of the Infant's Compromise Order upon the District Court of the Fourth Judicial District for the State of Idaho, in and for the County of Kootenai and to provide the United States District Court, Eastern District of New York with proof of service.

(k)     Ordering that the Petition to Settle of APRIL BRYANT and WAYNE BRYANT and the accompanying exhibits, the Attorney's Affidavit of Christina Ctorides, Esq., and the instant Order granting the Petition, be sealed until such time as the remaining Chiari cases are concluded; and it is further

(l)     Ordering that upon the conclusion of the remaining Chiari cases the instant Order, the Petition to Settle the Infant's Claim with accompanying exhibits and the Attorney's Affidavit shall be made public except that all references to monetary amounts, including the settlement amount, the division of same, the attorneys' fees and costs, and any references to the infant's full name and date of birth shall be redacted from said documents before they are made public.

(m)     Ordering that within thirty (30) days of the resolution of the remaining Chiari cases, Plaintiff's counsel shall submit redacted versions of the instant Order, the Petition to Settle the Claim with exhibits, and the Attorney's Affidavit, in the manner outlined in the preceding paragraph, which shall become public record.

Dated:     New York, New York
              January 22, 2015

**CHRISTINA CTORIDES**

Sworn to before me on this

22 day of January, 2015.

NOTARY PUBLIC

**JESSICA L SIMON**
Notary Public, State of New York
Registration #01SI6294499
Qualified in New York County
Commission Expires Dec. 23, 2017

29